

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-21-00096-CV

IN THE INTEREST OF Z.H. AND Z.H., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2020-1156-DR

Before Morriss, C.J., Stevens and Carter,* JJ.
Memorandum Opinion by Justice  Stevens

_____
*Jack Carter, Justice, Retired, Sitting by Assignment

# MEMORANDUM OPINION

The Department of Family and Protective Services (the Department) filed a petition to terminate Father's parental rights to his sons, Zach and Zeke.[1]  After a bench trial, the trial court terminated Father's parental rights on finding that (1) he knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, (3) he failed to comply with the provisions of a court order that specifically established, under Section 161.001(b)(1)(O), the actions necessary for him to obtain the children's return, (4) he used a controlled substance in a manner that endangered the health or safety of the children, as described in Section 161.001(b)(1)(P) of the Texas Family Code, and (5) termination of his parental rights was in the children's best interests.[2]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P), (b)(2) (Supp.).

In his sole point of error on appeal, Father challenges the trial court's best interests finding and argues that it was not supported by factually sufficient evidence.  Because we conclude that the evidence was factually sufficient to support the finding that termination of Father's parental rights was in Zach's and Zeke's best interests, we affirm the trial court's judgment.

---

[1]We use pseudonyms to protect the identity of the children.  *See* TEX. R. APP. P. 9.8.

[2]Mother's parental rights were also terminated, but she is not a party to this appeal.

## I.      Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.—Texarkana 2015, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is "required to 'engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights.'" *Id.* at 919–20 (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* at 920 (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "This standard of proof necessarily affects our review of the evidence." *Id.*

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

> In determining the best interests of the child, courts consider the following *Holley* factors:
>
> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). "There is no requirement that the party seeking termination prove all nine factors." *In re N.L.D.*, 412 S.W.3d at 819 (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Also, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *In re L.E.S.*, 471 S.W.3d at 920 (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine

4

'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d at 109 (quoting *In re C.H.*, 89 S.W.3d at 25) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002))). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). To make this determination, we undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

## II.    The Evidence at Trial

At the time of their removal from Mother and Father, Zach was three and Zeke was one. Emily Pillows, the Department's conservatorship worker, testified that the Department received an intake on June 17, 2020, alleging that Zach was living in an unsuitable camper trailer where

5

there was possible drug use, that Zach was suffering from physical neglect, and that Father was allegedly locking Mother and Zeke outside of the trailer without food or drink. When Pillows reached out to Mother, she said that Father had kicked her out of the trailer and that she and Zeke were staying with people she did not know who had picked her and the baby up from the side of the road. When Pillows spoke to Father, he claimed that Mother had significant mental health issues, that he did not kick her out, and that she had left with the baby.

When asked about the intake, Father admitted that he had used drugs in the past, denied using drugs at that time, and said Mother used methamphetamine. According to Pillows, Mother said that she had not used drugs but that Father had used methamphetamine in front of her and the children. Mother claimed that, if she tested positive, it would be because of Father's actions. Even so, Mother clarified that she made no attempts to remove the children from the environment in which Father was using drugs. Patty Christian, an investigator with the Department, spoke with Mother, who said Father was using methamphetamine daily for the past two months and had done so in the children's presence. John Arthur Tarver, a laboratory manager for Quest Diagnostics, testified that, on June 19, 2020, Mother tested positive for methamphetamine and amphetamine. Pillows testified that Father initially refused to comply with her request to take a drug test, but, according to Tarver, Father also tested positive for methamphetamine and amphetamine on July 6 and August 26, 2020.

As for the home environment, Pillows testified that "[t]he conditions were very poor." Pillows continued, "The inside of the camper . . . was extremely small. There were . . . piles of clothes all over the place[, and] . . . . there was an odor in the home." Pillows also stated that

6

there were no beds and that boxes of miscellaneous items were strewn all over the trailer. Pillows said that there was barely enough room in the living area for her to stand with Father, that the camper trailer was not big enough for four people to live in, and that it was not suitable for Zach to live in. Pillows added that, although the camper trailer had electricity, there was "very little food."

As for Zach, Pillows said that he was filthy, had dirt all over his face and caked underneath his fingernails, wore dirty clothes, and had "extremely greasy and oily" hair. Pillows could tell that the child had not been bathed in a while and had been neglected. Latrice Russell, a Department caseworker, testified that both Zach and Zeke were suffering from delayed development. According to Russell, Zach was not speaking, was having trouble eating solid foods, and was diagnosed with autism, and Zeke was not crawling. Michael D. Bell, Mother's stepfather and the children's placement, testified that, when the children arrived, Zach had bed bugs in his hair, was disoriented, and kept screaming and licking his knee and that Zeke slept all the time and was an inactive baby. Russell explained the Department's efforts to assist the children with their developmental delays.

Russell, who became involved in the case in October or November 2020, spoke about Father's efforts to obtain the children's return. She testified that Father was aware of the family service plan, which the trial court incorporated into an order on August 26, 2020. Under the plan, Father was to maintain stable employment and housing, attend and complete parenting classes, attend substance abuse treatment, complete an assessment with East Texas Council on Alcoholism & Drug Abuse (ETCADA), submit to random drug screenings, complete a

7

psychological evaluation, attend individual counseling, complete domestic violence classes, and refrain from criminal activity. According to Russell, Father did not complete any portion of his court-ordered family service plan.

Russell testified that Father failed to submit to her requests for drug testing on four separate occasions and, as a result, the tests were presumed positive. Father was also incarcerated for "breaking into people's houses" in December 2020 for a period of six months, after which Russell contacted Father again to discuss resuming services under the family service plan. Although Father was granted visitation, Russell testified that he missed several visits. Russell said that Father's only face-to-face visit with his children was not appropriate, that the Department found a pocketknife in the children's diaper bag, and that Father became upset and left the visit upset. Father did not have transportation and never provided any proof of employment. Russell said that neither Mother, who was unemployed and living with drug users, nor Father were able to provide a safe and stable living environment or financially provide for the children, and Christian testified that the children's proximity to serious drug use endangered them physically and emotionally. Russell also testified that Father had lost care of his other children to the Department, including one child that was removed for drug-related reasons. As a result, Russell believed that it was in the children's best interests for Mother's and Father's parental rights to be terminated.

Russell testified that the children were placed with Bell and his wife, the children's maternal grandmother, who wished to adopt them. Both Russell and Vijay Kuppurajan, the Court Appointed Special Advocate and resident physician at Christus Good Shepherd, testified

8

that they witnessed much improvement in the boys since their placement and that Bell's home was a stable environment where their special needs were addressed. Russell said that Zach was happy, that the foster parents worked with him to develop communication skills though he was still nonverbal, and that it would be disruptive to remove him from Bell's home. She also said that Zeke was thriving, received services from Early Childhood Intervention, and was now walking. Bell, who had cared for the children for more than one year, testified that he worked for Pepsi Cola, that his wife worked for Brookshire's grocery, and that the children enjoyed being in daycare during work hours. Bell said that he could provide for the children and wanted to adopt them.

Despite being properly served, neither Mother nor Father appeared at trial, and their plans for the children were unknown. As a result, after hearing the evidence, the trial court found grounds to terminate both parents' rights to Zach and Zeke and determined that it was in the children's best interests.

## III. Analysis of the *Holley* Factors

Father argues that the evidence was factually insufficient to find that terminating his parental rights was in Zach's and Zeke's best interests. After weighing the *Holley* factors, we disagree.

As for the first *Holley* factor, Zach and Zeke were too young to express their desires. Even so, "[w]hen children are too young to express their desires, the fact[-]finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re R.W.*, 627 S.W.3d 501, 517 (Tex. App.—Texarkana 2021, no

9

pet.) (citing *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

Zach was three at the time of removal, but Zeke, who was one, had spent minimal time with Father, was just learning to speak, and was using words like "mom" and "dad" in Bell's home. The evidence showed that Zach and Zeke were bonded to their maternal grandmother and Bell, were thriving in their placement, and were loved and cared for. Because Father did not appear at trial, there was no evidence that the children were still bonded to him or that he wished for the children to be returned to him. As a result, we find that the first *Holley* factor weighs in favor of terminating Father's parental rights.

Considering the second factor, both Zach and Zeke were developmentally delayed. Zach was diagnosed with autism and was nonverbal, and Zeke had not learned to crawl in a timely manner. Bell testified that Zach screamed and had nightmares shortly after his placement. Both children were receiving treatments and therapies to address their conditions. Even though Zach's and Zeke's emotional and physical needs were great, Father had no stable job or transportation and had not provided proof of a stable residence. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re C.A.J.*, 459 S.W.3d 175, 183 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)). We find that the second *Holley* factor weighs in favor of termination of parental rights.

In evaluating the third through eighth *Holley* factors, we recognize that "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *Id.* (quoting *In re I.R.K.N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2004, pet.

10

denied) (mem. op.)); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."). "A parent's inability to provide adequate care for h[is] child, lack of parenting skills, and poor judgment may be considered when looking at the child[ren]'s best interests." *In re N.L.D.*, 412 S.W.3d at 819 (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "[P]arental drug abuse is also a factor to be considered in determining a child's best interests." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)).

The record showed that Father used methamphetamine and tested positive for drugs during the pendency of the case. According to Mother, Father used methamphetamine in the children's presence daily. Father had lost custody of all his other children in favor of the Department, including a child who was removed for drug-related reasons. Christian explained how Father's drug use endangered the children. Father's home was dirty and overcrowded and lacked adequate space for the children. Zach, who was in Father's care, was filthy, had not been bathed, had bed bugs in his hair, and was described by Pillows as neglected. The evidence also showed that Father allowed Zeke to leave the home and be picked up by strangers, along with Mother, who Father said used methamphetamine. Father was jailed during the pendency of the case on charges of burglary. Father's history of drug abuse and poor decisions established that he had been a danger to Zack and Zeke.

Also, Father did not complete any portion of his family service plan, including parenting classes and substance abuse treatment, and failed to avail himself of individual counseling. Because Father tested positive for drugs twice during the pendency of the case and refused four

11

other requests to take a drug test, nothing showed that Father had conquered his drug addiction, which was necessary to becoming a capable parent. Father's drug use and other criminal activity during the case, anger during an in-person visit with the children, placement of a pocketknife in the children's diaper bag, and failure to attend virtual and telephone visits indicated that the existing parent-child relationship with Zach and Zeke was not a proper one. By trial, nothing showed that Father had transportation, income, or a stable home. While there was no evidence of Father's plan for the children, the Department's plan was for the children to be adopted by their material grandmother and Bell, who had loved, cared for, and provided for the children and their special needs for over one year. We find that the third through eighth *Holley* factors weigh in favor of terminating Father's parental rights.

As for the last *Holley* factor, Father did not appear for trial despite being properly served. Even assuming Father had transportation issues or would use being jailed as an excuse for failing to complete some portions of the family service plan, Father had no excuse for his drug use or failure to attempt any portion of the service plan when he was released from jail.

Considering the *Holley* factors and viewing all the evidence, we conclude that the trial court could have reasonably formed a firm belief or conviction, by clear and convincing evidence, that termination of Father's parental rights was in Zach's and Zeke's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Supp.). As a result, we find the evidence factually sufficient to support the trial court's best interests finding and overrule Father's sole point of error.

**IV.     Conclusion**

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:     January 31, 2022
Date Decided:       February 4, 2022